# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
October 2, 2002 Session

## STATE OF TENNESSEE v. PAUL DENNIS REID, JR.

**Direct Appeal from the Court of Criminal Appeals**
**Criminal Court for Davidson County**
**No. 97-C-1834      Cheryl Blackburn, Judge**

---

**No. M1999-00803-SC-DDT-DD - Filed November 26, 2002**

---

In this capital case, the defendant, Paul Dennis Reid, Jr., was convicted of two counts of first degree murder and one count of especially aggravated robbery for killing two Captain D's employees and robbing one of the employees. As to each conviction of first degree murder, the jury found in the sentencing hearing that the State had proven three aggravating circumstances beyond a reasonable doubt – (1) that the defendant was previously convicted of one or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person; (2) that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and (3) that the murder was knowingly committed, solicited, directed, or aided by the defendant while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit robbery. Tenn. Code Ann. § 39-13-204(i)(2), (6), and (7) (1997). Finding that these aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt, the jury sentenced the defendant to death on each murder conviction. The trial court subsequently imposed a twenty-five-year sentence for the especially aggravated robbery conviction and ordered this sentence to be served consecutively to the two death sentences. On direct appeal to the Court of Criminal Appeals, the defendant mounted numerous challenges to both his convictions and sentences. After fully considering the defendant's claims, the Court of Criminal Appeals affirmed the trial court's judgment. Thereafter, the case was docketed in this Court. See Tenn. Code Ann. § 39-13-206(a)(1) (1997). After carefully and fully reviewing the record and the relevant authority, the defendant's convictions and sentences are affirmed.

### Tenn. Code Ann. § 39-13-206(a)(1) Automatic Appeal; Judgment of the Court of Criminal Appeals Affirmed

FRANK F. DROWOTA, III, C.J., delivered the opinion of the court, in which E. RILEY ANDERSON, JANICE M. HOLDER, and WILLIAM M. BARKER, JJ., joined. ADOLPHO A. BIRCH, JR., filed a concurring & dissenting opinion.

Jeffrey A. DeVasher; C. Dawn Deaner, J; Michael Engle; and David Baker; Assistant Public Defenders, Nashville, Tennessee, for the Appellant, Paul Dennis Reid, Jr.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Jennifer L. Smith, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Kathy Morante, Tom Thurman, Roger Moore, Grady Moore, Assistant District Attorney Generals, for the Appellee, State of Tennessee.

**OPINION**

**I. Background**

**A. Guilt Phase**

The proof offered by the State at the guilt phase of this trial demonstrated that on Sunday morning, February 16, 1997, sixteen-year-old Sarah Jackson and twenty-five-year-old Steve Hampton were shot and killed as they prepared to open the Captain D's restaurant on Lebanon Road in Donelson, Tennessee. Hampton was the manager of the restaurant; Jackson was a high school student working part-time at the restaurant. Kevin Blackwell, area director for Captain D's, spoke with Hampton on the telephone around 8:15 to 8:30 a.m. that morning. Over an hour later, around 9:45 to 10 a.m., Michael Butterworth arrived for work but was unable to enter the restaurant because the doors were locked. Butterworth telephoned the Captain D's from a neighboring restaurant and got a busy signal. When he called a second time a few minutes later, no one answered. Believing something was wrong, Butterworth contacted another Captain D's employee whose father was a Metro police officer. The employee's father, Officer Jeff Wells, arrived at the scene and, after the assistant manager of Captain D's unlocked the door, entered the restaurant between 11 a.m. and noon to find Hampton and Jackson dead, lying face down on the floor inside the restaurant's walk-in cooler.

The victims had been shot execution-style while lying on the floor. Hampton had been shot twice in the back of the head and once in the back. Jackson had been shot four times in the head and once in the back. According to the medical examiner, two of Jackson's head wounds were fatal, but the two other head wounds were superficial, and the shot to her back was not immediately incapacitating. If these less serious wounds had been inflicted first, the medical examiner testified Jackson may have been able to move; and, in fact, a blood pattern of Jackson's gloved hand on shelving near, but above, her body indicated that Jackson had attempted to pull herself up from the floor after she was shot. The victims were shot with a .32 caliber weapon, probably a revolver. Seven thousand, one hundred forty dollars, including $250 in coins, was taken in the robbery. Hampton's wallet, which contained $600 that he intended to use to pay rent, also was missing.

The police first considered the defendant a suspect in this crime on June 12, 1997, after his arrest in Cheatham County for allegedly attempting to kidnap the manager of a Shoney's restaurant. From this arrest, the police obtained the defendant's fingerprints and photograph. Although none of the defendant's fingerprints were found at Captain D's, several items belonging to Steven Hampton were discovered one day after the murders lying alongside Ellington Parkway, a four-lane highway in East Nashville.[1] Among the items found was a movie rental card belonging to Hampton. The defendant's right thumbprint was found on this card. The area where Hampton's belongings were found was 11.5 miles from the crime scene and 1.2 miles from the defendant's home.

Police also found several shoe prints inside Captain D's near the safe. Although the tread design of these shoe prints did not match, the length of these shoe prints was consistent with shoes seized from the defendant's residence. In addition, the State introduced into evidence a photograph, dated July 16, 1996, which showed the defendant wearing a pair of dingy white tennis shoes that police had not found in his residence.

Two witnesses identified the defendant as the man who came by Captain D's the night before the murders inquiring about a job. Michael Butterworth and Jason Carter testified that a man came into the restaurant through the exit door around 10 p.m., shortly before closing the night before the murders. This man said he was interested in applying for a part-time job and that he worked at Shoney's just down the road. The proof showed the defendant worked as a cook at a Shoney's 2.1 miles from these murders. Butterworth and Carter gave the man an employment application and told him that the manager, Steve Hampton, would be working the next day. When the man asked if anyone would be at the restaurant on Sunday morning, Carter told him that Hampton would be there but would be busy and unable to talk until approximately 2:45 p.m., after the Sunday lunch rush. Butterworth testified that the man left in a dark-colored car.

About a week after the murders, Butterworth, Carter, and James Cassidy, another employee who was present the night before the murders, helped police prepare a composite sketch of the man they had seen. The description they provided was consistent with the defendant in some respects, but the sketch did not include a mustache and it indicated that the man may have had long hair worn in a ponytail that was "pulled straight back." The defendant wore a mustache at this time and did not have a ponytail, although there was testimony that his hair had been below his collar at that time and that he combed his hair straight back.

After assisting with the composite, Carter and Butterworth looked at hundreds of police photographs but were unable to make an identification. In June of 1997 the police showed Butterworth and Carter a photographic lineup of six individuals, including the defendant. Although Butterworth was unable to make a positive identification, Carter positively identified the defendant

---

[1] Police discovered Hampton's personal effects because of information provided by Mr. Charles Simpson, who, while looking for aluminum cans alongside Ellington Parkway on the afternoon of the murder, discovered Hampton's children's identification cards. Believing that the owner of the cards had been robbed but unaware of the murders, Mr. Simpson immediately reported his discovery to police. The next day, February 17, 1997, officers returned to the same area and found Hampton's driver's license, credit card, movie rental card, and birth certificate card.

as the man who had inquired about a job the night before the murders. A short time later, Butterworth saw the defendant during a television news report about his arrest. Butterworth immediately called the police and informed them that the defendant was the man who came into Captain D's the night before the murders. At trial, Butterworth explained that he was sure of this identification because the news report, as opposed to the photographic lineup, enabled him to hear the defendant's voice, see the way his lips moved when he talked, and see the way he walked. During trial, both Carter and Butterworth identified the defendant as the man who had come into the restaurant the Saturday night before Hampton and Jackson were killed.

Three other people who had been driving by the Captain D's restaurant on the morning of the murders testified, linking the defendant to the murders. Jerry Marlin, who was passing by the restaurant at approximately 8:45 a.m., saw a blue Ford station wagon with damage to the left front, and possibly to the left rear, "parked at a funny angle toward the rear of the building." The proof showed that prior to these murders, the defendant drove a light blue 1988 Ford Escort station wagon which had been involved in an auto accident in January of 1997. As a result, the car was appraised by an insurance company on February 3, 1997, and was found to have damage to the left front end. Marlin testified that the defendant's car in the insurance company's photographs was similar to the car he observed in the Captain D's parking lot the morning of the murders.

Around 8:50 a.m., Debbie Hines was driving by Captain D's on her way to church when she saw a man, whom she later identified as Steve Hampton, standing inside the doorway of the restaurant talking to a man outside who was holding white paper in his hand. Hines described the unidentified man as dark-haired and approximately five inches taller than Hampton. This description was consistent with the defendant who was dark-haired and approximately six feet, three inches tall, as compared to Hampton whose height was five feet, eight inches.

Around 9:30 a.m., another passerby, Mark Farmer, noticed "a car that sort of looked out of place." According to Farmer, the small to medium-sized car was parked about a car-length away from the front of the building headed in the opposite direction of the drive-thru arrows painted on the lot. Farmer initially remembered it was a light blue car, but at trial he stated it also may have been painted a "pinkish plum color." Farmer also noticed a man walking hurriedly away from the restaurant toward the car. When the man stopped at the passenger side of the car and looked up, Farmer testified that the man "elevated his face and . . . it seemed like our eyes sort of caught one another, and when he saw that I was watching him, he dropped his head, just completely down in a suspicious way." The man entered the passenger side of the car. Farmer described the man as tall, with a muscular build and large neck, dark eyebrows and dark eyes, a full head of hair which was slicked back. Farmer said the man was wearing a white shirt, dark pants, and white, "not new," tennis shoes. Farmer heard about the murders the next day and called the police twice to report what he had seen, but no one contacted him. When Farmer saw the defendant on television after his arrest in June of 1997, Farmer again called the police and identified the defendant as the man he had seen near the Captain D's on the morning of the murder.

The State also offered proof to show that the defendant had been interested in obtaining a gun during the months before the murders and had discussed the profitability of robbing fast food restaurants. Jeffrey Potter, the defendant's co-worker at Shoney's, testified that the defendant was dissatisfied with the money he made at Shoney's and told Potter there were other ways of making money, and one way to do so was robbery. The defendant also had asked Potter where he could get a gun, and then had asked Potter to get the gun for him. Potter refused.

Another of the defendant's co-workers, Danny Wayne Tackett, testified that he had first met the defendant in 1995, while working at Shoney's. The defendant had moved to Texas but returned to Tennessee in 1996. Tackett described himself as the defendant's best friend in Nashville and said the defendant had lived with him a few weeks after the defendant returned to Tennessee, near the end of 1996. Prior to these murders, the defendant had asked both Tackett and Tackett's wife to procure a handgun for him. On one occasion, Tackett accompanied the defendant to a pawn shop in Nashville where the defendant selected a .32 caliber revolver, but Tackett refused to purchase the weapon. Later, the defendant asked Tackett's wife to purchase a gun for him, but she also refused to do so. The defendant then made arrangements for another Shoney's employee to procure a gun for him, and he gave Tackett $200 or $300 in cash to hold for him until he met with the employee to pay for the gun. Although their co-worker successfully procured a shotgun, the defendant refused to purchase the weapon, saying that it was too large and that he needed a smaller weapon. Shortly before these murders, however, the defendant arrived unexpectedly at Tackett's house to retrieve the money Tackett was holding for him. The defendant left with the money but returned about ten minutes later with a man Tackett did not know. The defendant asked Tackett to "vouch" for him to the man. Tackett advised the unidentified man that he and the defendant were acquaintances, and the two men left together.

The defendant told Robert Bolin, from whom he purchased two .25 automatic pistols after the murders, that he had previously had a .32 caliber revolver and "didn't like the way it shot" and wanted something with a clip that held more shells. According to expert testimony, .32 caliber revolvers generally do not automatically eject bullet casings and must be manually opened after six shots to remove the cartridges and reload the weapon. As previously stated, the victims in this case were shot with a .32 caliber revolver eight times; therefore, the perpetrator would have been required to reload the weapon during the shooting.

The State also offered proof to show that the defendant, whose net pay was around $120 per week, was in financial trouble before these murders but had large sums of money, mostly cash, afterwards. Tackett described the defendant's financial situation before the murders as "desperate." The defendant and Tackett discussed making money by robbing fast food restaurants in the middle of the night, when there would be no witnesses but plenty of cash. Tackett testified that he had assumed these discussions were simply hypothetical and did not believe the defendant was being serious. The defendant was scheduled to work the day of the murders, but he called to say he would not be coming in because of car trouble. A short time after these murders, the defendant quit his job at Shoney's.

The proof showed that shortly after these murders the defendant had large amounts of cash and purchased items and paid off obligations in cash. For example, Tackett observed the defendant with $100 to $200 in five-dollar bills. When Tackett asked why he had so many five-dollar bills, the defendant replied, "just to be different." The defendant had obtained a $200 loan using his car title as collateral on February 4, 1997, and the defendant paid this loan off in cash on February 21, 1997. On February 18, 1997, the defendant paid $2000 in cash, all in twenty-dollar bills, towards a prepaid lease on a new red Ford Escort. Two days later, he returned to the car dealership and paid off the remaining balance of the lease – $3,127.92. When the salesman asked where he had obtained this large amount of cash, the defendant replied, "Well, I've been very good at saving and my dad is going to be helping me." However, there was no proof that the defendant had a savings account. As to the defendant's checking account, the proof showed a balance of $742.61 on December 19, 1996, a balance of $134.45 on January 22, 1997, a balance of $139.95 on February 2, 1997, and a balance of $803.67 on February 27, 1997.

Bernie Billingsly and the defendant belonged to the same fitness center, and during either the last week of February or the first week of March 1997, the defendant told Billingsly that he had about $3,000 that he would like to invest and asked Billingsly for tips on stock market investing. Two to three weeks later, the defendant told Billingsly that he had read Barrons Investment Guide and had purchased a mutual fund.

After the defendant's arrest in June of 1997, the police seized four one-gallon jugs containing over $1000 in coins from his residence. The coins appeared to be layered according to their denomination. Tackett testified that he had not seen any large bottles containing coins when he helped the defendant move or when the defendant lived with him.

The defense presented the testimony of Tennessee Bureau of Investigation Agent Samera Zavaro, who said that the DNA found on cigarette butts discovered inside Captain D's did not match DNA of the defendant or the victims. The defense also attempted to undermine the prosecution's case through cross-examination. The defense vigorously cross-examined the identification witnesses, pointing out discrepancies between the defendant's appearance and the descriptions given by these witnesses and emphasizing that these identifications were suspect because these witnesses had only a brief glimpse of the man, from a substantial distance, while driving a car at thirty to forty miles per hour. In addition, the defense asked questions to show that the murder weapon was never located, that a trash can missing from the restaurant was never located, that the defendant's fingerprints were not found at the scene of the crime, that the police failed to adequately investigate the items found at the scene, such as paper, cigarette butts, and hairs located on the victims' bodies, and that the bloodhounds used by the police on Ellington Parkway stopped near a residence that did not belong to the defendant.

After hearing this proof and receiving instructions from the trial court, the jury deliberated and found the defendant guilty of premeditated and felony first degree murder as to both victims and especially aggravated robbery. In accordance with this Court's decision in State v. Cribbs, 967 S.W.2d 773, 787 (Tenn. 1998), the trial court entered one judgment of conviction as to each victim.

**B. Sentencing Phase**

The case proceeded to the sentencing hearing where the State sought the death penalty for each first degree murder conviction, relying upon three aggravating circumstances: (1) that the defendant was previously convicted of one or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person; (2) that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and (3) that the murder was knowingly committed, solicited, directed, or aided by the defendant while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit robbery. Tenn. Code Ann. § 39-13-204(i)(2), (6), and (7) (1997).

In support of these aggravating circumstances, the prosecution presented the testimony of Texas assistant district attorney Brian Johnson, who had prosecuted the defendant when he was convicted of aggravated robbery in Harris County, Texas, in 1984. The parties stipulated that the offense of aggravated robbery as defined in the Texas Penal Code is a crime whose statutory elements involve the use of violence to the person, and Johnson testified that the defendant had been prosecuted and convicted of this crime. A certified copy of the judgment was entered into evidence. The State relied upon the evidence presented at the guilt phase of the trial to support the aggravating circumstances that the defendant knowingly committed the murder during a robbery and that the murder was committed for the purpose of avoiding arrest or prosecution.

The prosecution also presented victim impact evidence. The first witness was Steve Hampton's wife, Deanna Hampton, who testified that Hampton had been twenty-five when he died, that they had three children, ages three, six and eight, and that he had been a good father. Ms. Hampton testified that her husband's death had devastated her and led to her withdrawal from everyone, even her children. Both she and her children had received counseling, but Ms. Hampton testified that she would never fully recover. Steve Hampton's death had also adversely affected the couple's three children. The oldest child has withdrawn from everyone. Their youngest child associates his birthday with his father's death because the family had celebrated his birthday the night before the murder. The middle child, a daughter, often asks who will walk her down the aisle at her wedding. Ms. Hampton testified that her husband's death had also adversely affected her financial situation, which she described as "rough." Paula Sue Guidry, Steve Hampton's mother, testified about how the death of her son, her only child, had devastated her psychologically. She described their relationship as very close and said that she will never be able to get over losing him.

Several witnesses described the impact of Sarah Jackson's death on her family. Jerry Jackson, her father, testified that "part of me has died," that it is hard for him to be happy, that it is difficult for him to attend weddings and see other fathers walking their daughters down the aisle, and that his family's relationships were "broken" as a result of his daughter's death. Mr. Jackson felt guilty because he had allowed his daughter to work, and he opined that his family would never recover. He described his daughter as an intelligent girl, who had loved children. The next witness, Wayne Jackson, Sarah Jackson's older brother, told the jury that his sister's death had made him extremely angry and "hardened" his heart, that he knew she had suffered and had been afraid during

the crime, and that her suffering was senseless. He further testified that he had a close relationship with his sister during childhood and said he would miss having an adult relationship with her. Finally, he described how difficult her death had been on his parents because they both felt a great deal of guilt for allowing her to work. He also testified that his sister's murder had adversely affected his younger brother, who had withdrawn and would not talk about her death. The last witness was Gina Jackson, Sarah Jackson's mother. Ms. Jackson described her daughter as happy and fun-loving and testified that she had been killed just two days before her seventeenth birthday. Ms. Jackson also described how her daughter's death had seriously affected her younger son. Ms. Jackson, who was still undergoing counseling, also expressed how very difficult her daughter's death had been for her. She testified that she had believed her daughter would be safe working at the neighborhood Captain D's and said she often thought about how her daughter must have felt during the crime. Ms. Jackson explained that Sarah ordinarily was not allowed to work on Sunday but was allowed to work on the Sunday she was killed to earn extra money to buy a CD player for her car. Ms. Jackson related the deep feeling of guilt she had experienced as a result of allowing her daughter to work the Sunday morning she was killed. Ms. Jackson described Sarah as the most outgoing member of the family and testified that the Jackson family remembered her at family gatherings by setting out Sarah's picture, a candle, and a place setting.

The defendant presented several witnesses at sentencing: a private investigator for the defense, the defendant's older sister, a speech pathologist, a neuroradiologist and two psychologists. This testimony revealed that the defendant was born in Texas on November 12, 1957, and had two older sisters, Linda and Janet. The defendant's home life was described as unstable. His father, Paul Reid, Sr., a private investigator who repossessed cars, was an alcoholic and away from home a good deal of the time. The defendant's mother and father divorced when he was three years old. The defendant's father received custody of the defendant and his sister Janet while his sister Linda lived with his mother, who married Danny Morez, by whom she later had two more daughters. Because the defendant's father was away from home so much, the defendant and his sister Janet lived with their paternal grandmother, who had difficulty disciplining the defendant. By the age of four or five the defendant was causing problems in the neighborhood and seriously misbehaving at home. He stole mail from the neighbors, stole clothes from the neighbors' clotheslines, put tacks in his grandmother's soup, barricaded his grandmother in her room, set fire to her bed while she was in it, and beat her dog to death with a baseball bat.

Because of his father's neglect, the defendant did not start school until he was seven years old. His sister Janet testified that the defendant had a "hard time" in school. Shortly after entering school, the defendant was referred to the school psychologist and was later described as suffering from "minimal cerebral dysfunction." At the age of eight, he was sent to a Catholic school for boys in Houston, Texas, that later became the county school for neglected and dependent children. He went to live with his mother when she learned that he was going to be put up for adoption. At this time, the defendant's mother "renamed" him Paul Leon Morez because his name reminded her of her former husband. When the defendant was thirteen, his mother divorced Morez.

The defendant lived with his mother until he was sixteen. He was asked to leave after he attempted to sexually assault his sisters and his mother. After this he lived with his father sporadically but was basically on his own. In the early 1980s he married, but he was divorced in 1984. During the marriage, he had stolen city equipment to start a business. One of the defendant's sisters had warned his ex-wife not to marry him. The defendant lived with another woman in 1994. This woman reportedly said that the defendant had a temper, had thrown her kitten across the room, and had held her down on the couch and put a pillow on her face. His sister Linda was frightened of him, and he had threatened to kill her. Janet testified that he had attempted to sexually molest her when she was a teenager and had threatened her with a knife when their grandmother died. Janet testified that her brother became paranoid after he was imprisoned in Texas. She also described how the defendant had been "joking" and acting "silly," at his father's funeral in May 1997, by wearing a Burger King crown on his head and calling himself "King Paul." He had also worn a lime green shirt, shorts, and tennis shoes to the funeral and refused to change despite repeated requests from his sisters to do so. Janet further testified that the defendant had used drugs recreationally but otherwise hated drugs.

The defendant had a juvenile record of auto theft and simple assault. Another charge of forging checks was dismissed when he paid off the checks. In 1982, he was arrested and charged with several armed robberies but was declared incompetent to stand trial and was hospitalized in Texas. Later, in 1984, he was convicted of aggravated robbery in Texas. He dropped out of school but later earned his GED and was enrolled in Volunteer State Community College at the time of his arrest.

Testimony showed that the defendant had suffered multiple head injuries during his life. When he was five, he had been hit in the head with a brick. In 1971, he fractured his skull in a mini-bike accident and was hospitalized for some time. On another occasion, his head hit the windshield of a car that struck him while he was riding his bike. At a later indefinite date he suffered another head injury when he slipped at work. Finally, in 1990, he suffered a concussion and loss of consciousness as the result of a car accident.

Patsy Casey Allen, a licensed speech and language pathologist who evaluated the defendant in 1998, testified that the defendant suffered from speech and language problems characteristic of persons with traumatic brain injuries. Allen hypothesized that these injuries were acquired rather than the result of any developmental delay.

Dr. Pamela Auble, a clinical neuropsychologist specializing in brain abnormalities, testified that she had evaluated the defendant and found evidence of brain damage, particularly in the left frontal lobe, which caused "a significant mental disorder" impairing "his behavior in a pervasive way." Dr. Auble's evaluation entailed more than eight hours of interviews over the course of a year and the administration of eighteen standardized tests. She also reviewed the defendant's medical and school records and interviewed his mother and two of his sisters. Dr. Auble noted that there had been a malformation of the defendant's left ear at birth, possibly indicating brain damage to the left temporal lobe, that the defendant's hearing was impaired in his left ear, and that he had been

hyperactive since birth. Dr. Auble testified that the defendant first displayed evidence of psychosis in 1978, then again from 1982 to 1987. After his 1984 conviction for aggravated robbery, his symptoms continued, but he responded to medication. In 1987, the defendant reported delusions of being monitored by the Texas Department of Correction. He later denied any problems and received no treatment. In 1993, the defendant wrote letters to the governor of Texas, the Washington Post, and the citizens of Texas informing them that he had been under government surveillance since 1985 and that this surveillance was very costly to the taxpayers. He reported similar delusions of government surveillance to his sister, his girlfriend, and the police after his arrest in this case, and to Dr. Auble in 1998 and 1999. Dr. Auble related a history of mental illness in the defendant's family. She reported that the defendant had an IQ in the 80s and opined that the instability of his childhood environment was devastating for someone with his neurological abnormalities. Dr. Auble diagnosed the defendant as psychotic, secondary to temporal lobe damage with cognitive disorder and personality changes from brain injuries. She opined that he was not malingering and testified that he needed a structured environment. Dr. Auble admitted that the defendant met the criteria for anti-social personality disorder but felt that such a diagnosis was not helpful. Dr. Auble also agreed that neither the Minnesota Multiphasic Personality Inventory ("MMPI") nor the Rorschach personality test revealed evidence of psychosis. Dr. Auble also conceded that the defendant had a history of malingering.

Dr. Robert M. Kessler, a neuroradiologist, testified that Magnetic Resonance Imaging ("MRI") and Positron Emission Tomography ("PET") scans of the defendant's brain taken in 1998, revealed that the left side of his brain was atrophied. Dr. Kessler opined that a large portion of the defendant's left temporal lobe appeared not to be functioning properly. According to Dr. Kessler, this portion of the brain is responsible for visual and auditory processing, as well as emotional processing and memory. Dr. Kessler diagnosed the defendant as suffering abnormalities in his brain functions, likely caused by trauma to his head after the age of six or seven.

Dr. Xavier Amador, a clinical psychologist employed by Columbia University and the New York Pyschiatric Institute, conducted more than twenty hours of interviews with the defendant, interviewed the defendant's mother and sister, and reviewed all the defendant's records provided by the defense. Dr. Amador concluded that the defendant had suffered from paranoid schizophrenia, continuous type, for twenty years. Dr. Amador also diagnosed the defendant as having a cognitive disorder and personality change caused by head trauma, combined type.

Dr. Amador based his diagnosis upon the defendant's longstanding delusions about government surveillance and the defendant's medical history of repeated evaluations and treatments for some type of brain dysfunction or psychotic disorder. Dr. Amador also pointed out that the defendant had been prescribed at least eight different anti-psychotic drugs over his lifetime which, in general, improved his behavior. According to Dr. Amador, these drugs would have rendered a person without mental illness comatose.

Dr. Amador opined that the defendant's mental illness, his "broken brain," and psychological and social stressors interfaced to render him ill-equipped to deal with reality. When asked about the

results of the tests administered by Dr. Auble, Dr. Amador testified that the MMPI and Rorschach tests are adjunct tools and are not the primary diagnostic tools used in clinical practice. Dr. Amador opined that during the commission of the crimes, the defendant was under the influence of his delusions.

The last witness for the defense was Reverend Joe Ingle. As a result of his pastoral relationship with the defendant and his conversations with members of the defendant's family, Reverend Ingle realized that the defendant's version of reality was "utterly contradictory" to the reality revealed by his family. As a result, he contacted Dr. Amador and convinced him to evaluate the defendant.

In rebuttal, the State presented the testimony of Raymond Lackey, Jr., the attorney who had represented the driver of a car involved in a minor accident with the defendant's car in early 1997. Lackey testified that the defendant had done "a really fine job" representing himself in April of 1997 in the Davidson County General Sessions Court. Lackey testified that the defendant had been friendly and respectful before, during, and after the proceeding. Lackey admitted that he had only brief contact with the defendant before and during the relatively short trial and that the defendant's claim was unsuccessful.

The State also introduced evidence showing that in early 1997 the defendant had earned A's in developmental courses in English, math and study skills at Volunteer State Community College and that he was "on the way to college level classes." The State then recalled Brian Johnson, the prosecutor in the 1984 aggravated robbery case in Texas, who testified that the defendant had "performed antics" whenever the jury was in the courtroom during his competency trial, such as falling over backwards in his chair, shooting paper in the air with a rubber band, and making a paper hat and placing it on his attorney's head. The defendant had stopped "putting on" when the jury was not in the courtroom. Several months after the defendant was convicted, he wrote a letter to Johnson, apologizing for his behavior in the courtroom, stating that he felt threatened in prison, and asking Johnson for help in shortening his sentence. According to Johnson, the letter, in which the defendant offered to pass on information about other inmates, was logically written and not bizarre or unreadable.

The State's next witness was Dr. Helen Mayberg, a professor of psychiatry and neurology at the University of Toronto, who was qualified as an expert in neurology, neuropsychology and functional brain imaging. Dr. Mayberg had reviewed Dr. Kessler's MRI and PET scans and agreed that they showed evidence of abnormality restricted to the left side of the temporal lobe. Dr. Mayberg, however, opined that these abnormalities were congenital and not medically known to be associated with schizophrenia or the commission of premeditated murder.

The State's last witness was Dr. Daniel Martell, a forensic neuropsychologist. Dr. Martell interviewed the defendant over two days for about twelve hours and also reviewed all of the defendant's records and the reports from the other experts in this case. Dr. Martell concluded that the defendant suffers from a mild neurocognitive disorder, antisocial personality disorder, and a

delusional disorder. Dr. Martell determined that the defendant was born with an abnormal brain leading to hearing, learning, and speech disorders. Dr. Martell was certain that the defendant met the criteria for antisocial personality disorder[2] and said that he was also probably suffering from a delusional disorder with grandiose and persecutory features that was in substantial remission. Dr. Martell further testified that these disorders had not substantially impaired the defendant's judgment or his capacity to conform his conduct to the requirements of the law or to know right from wrong. To the contrary, Dr. Martell opined that the facts of this case illustrate that the defendant had been able to effectively use his cognitive abilities to plan, execute, and cover-up his criminal actions. Dr. Martell had found the defendant's IQ to be between 80 and 90, a low average IQ, and said that the various tests administered to the defendant did not reveal any evidence of psychosis.

In surrebuttal, the defendant once again presented the testimony of Dr. Xavier Amador, who reiterated his diagnosis of schizophrenia and testified that the defendant was under the influence of his delusion when he killed the victims.

Based upon this proof, the jury found that the State had proven the aggravating circumstances beyond a reasonable doubt and that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Therefore, the jury sentenced the defendant to death on each conviction of first degree murder.

## II. Motion to Suppress
### A. Admissibility of Identification Testimony

The defendant filed a pre-trial motion to suppress the identification testimony of Michael Butterworth and Mark Farmer, arguing that the procedures leading to their identifications of the defendant were unduly suggestive and violated his due process rights. The trial court denied this motion. The Court of Criminal Appeals affirmed on the basis that no state action was involved in the witnesses' identification of the defendant from the television coverage. In this Court, the defendant argues that the presence or absence of state action is not dispositive, and he urges this Court to review the circumstances surrounding the witnesses' identification when determining whether due process was violated. A brief review of the circumstances surrounding these identifications is necessary to place this issue in context.

As previously stated, the record reflects that Butterworth spoke with the defendant for a few minutes on February 15, 1997, the night before the murders, when the defendant inquired about employment at Captain D's. Butterworth also worked with police to create a composite drawing of the defendant, although the drawing was not entirely consistent with the defendant's appearance. Attempting to identify the perpetrator, Butterworth looked at many police photographs, and in June of 1997, Butterworth was shown a photographic lineup that contained a photo of the defendant and five other persons. While not positively ruling out any of the persons shown, Butterworth was

---

[2]Antisocial personality disorder is characterized by the failure to conform to social norms, deceitfulness, irritability and aggressiveness, and lack of remorse.

unable to identify anyone in the array as the man with whom he had spoken on February 15. The next day, while watching the news on television, Butterworth saw coverage of the defendant's arrest, immediately recognized the defendant, and called the police to identify him as the man he encountered at Captain D's the night before the murders. Butterworth explained that he was able to identify the defendant because, unlike the photographic lineup, the news report enabled him to hear the defendant's voice, see the way his lips moved when he talked, and see the way he walked.

As to Farmer, the record indicates that he was driving by Captain D's around 9:30 a.m. on the morning of the murders when he saw a man leave the restaurant and approach a car parked in an unusual manner at the front of the building. Farmer and the man made direct eye contact before the man looked away in a suspicious manner. After hearing about the murders, Farmer phoned the police three times to report seeing the man at the restaurant, but the police never contacted him about what he had seen. Then, in June of 1997, Farmer saw televised news coverage of the defendant's arrest, instantly recognized the defendant as the man he had seen on the morning of the murders, and again called the police with this information.

Significant to our analysis is the undisputed fact that the police had not told either Butterworth or Farmer to watch the television news broadcasts that resulted in their identifying the defendant. Their viewing is best described as accidental, inadvertent, or coincidental. It was not orchestrated by police. To the contrary, the record reflects that police officers had advised the defendant after his arrest that he could avoid media coverage by covering his head with a jacket and by facing the wall during court proceedings so the television cameras and observers would be unable to see his face. The defendant at first indicated that he intended to follow this advice. Just before leaving the jail, however, the defendant apparently changed his mind, stating "This is going to be the Paul Reid trial." Therefore, the defendant did not cover his head, and he turned around and faced everyone in the courtroom during the arraignment. Thus, the defendant's decision to make it a "Paul Reid trial," rather than state action, led directly to Butterworth's and Farmer's identification testimony.

While this Court has not previously addressed this issue, it is well-settled Tennessee law that in the absence of state action in the identification process, constitutional due process rights are not implicated; therefore, the analysis adopted by the United States Supreme Court in Neil v. Biggers, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972) is not appropriate in this case. See, e.g., State v. Drinkard, 909 S.W.2d 13, 15-16 (Tenn. Crim. App.), perm. app. denied (Tenn. 1995) (refusing to find the identification unduly suggestive and violative of due process because the police did not arrange the confrontation between the defendant and the witness) (citing cases); State v. Newsome, 744 S.W.2d 911, 917 (Tenn. Crim. App.), perm. app. denied (Tenn. 1987) (refusing to find the identification unduly suggestive and violative of due process because the police did not arrange the encounter between the defendant and the victim); State v. Dixon, 656 S.W.2d 49, 51 (Tenn. Crim. App.), perm. app. denied (Tenn. 1983)(refusing to find the identification unduly suggestive and violative of due process because a confrontation between the defendant and the victim was not a showup arranged by the police); State v. Mosby, 639 S.W.2d 672, 673 (Tenn. Crim. App.), perm. app. denied (Tenn. 1982)(refusing to find the identification unduly suggestive and violative of due

process because there was no state action where the victim identified the defendant after a neighbor showed the victim a single photograph); Bishop v. State, 582 S.W.2d 86, 91 (Tenn. Crim. App. 1979) (refusing to find the identification unduly suggestive and violative of due process because there was no state action where a witness first identified the defendant from a single picture in a local newspaper). Moreover, in so holding, the law in Tennessee is consistent with the rule adopted by a majority of jurisdictions that have considered this issue. See generally Annotation, "Admissibility of In-Court Identification As Affected by PreTrial Encounter That Was Not Result of Action by Police, Prosecutors, and the Like," 86 A.L.R. 5th 463 (2001) (citing cases). In a scholarly opinion, the Rhode Island Supreme Court explained why a broader rule is unnecessary :

> [W]e conclude that absent state action, no constitutional violation that would give rise to the creation of an exclusionary rule has been committed.
>
> * * *
>
> Probably the best guarantee of due process in such a situation as that presented by the case at bar would be the opportunity for cross-examination in order to expose the witness's lack of credibility. This opportunity is further buttressed and enforced by the requirement that the state prove every element of the crime, including the identity of the accused beyond a reasonable doubt. The guarantee is also supported not only by the requirement of a unanimous jury verdict but also by the power of the trial justice to review the evidence, including credibility, on a motion for new trial.
>
> Thus, the due-process rights of defendant in this case, as in all criminal cases, are adequately protected from violations of due process without the fashioning of additional exclusionary rules, whether pursuant to the Federal or the Rhode Island Constitution.

State v. Pailon, 590 A.2d 858, 863 (R.I. 1991).

This case well illustrates the soundness of the Rhode Island Supreme Court's analysis. Here, the trial court scrupulously applied the rules of evidence which admit only relevant evidence that is not unduly prejudicial or misleading. The defendant's attorneys effectively cross-examined these witnesses, focusing upon the weaknesses in their identifications. The trial court properly instructed the jury as to eyewitness testimony, in accordance with this Court's decision in State v. Dyle, 899 S.W.2d 607, 612 (Tenn. 1995). The jury's verdicts of guilt were unanimous, and the trial court approved these verdicts as the thirteenth juror. Like the Rhode Island Supreme Court, we conclude that the due process rights of criminal defendants are quite adequately protected by existing rules and procedures. Absent evidence of state involvement in Butterworth's and Farmer's identifications of the defendant, constitutional due process is not implicated, and the analysis adopted by the United States Supreme Court in Neil is not applicable. The identification testimony was properly admitted. This issue is without merit.

**B. Validity of Search Warrants**

The defendant next argues that the trial court and Court of Criminal Appeals erred by refusing to suppress certain evidence seized from his residence under the authority of two search warrants – Warrants 146 and 149. The defendant argues that both warrants were invalid because the items seized were not particularly described in the warrants, the affidavits to each warrant do not demonstrate a nexus between the criminal activity and the place to be searched, and the police failed to personally deliver copies of the warrants to the defendant in violation of Tennessee Rule of Criminal Procedure 41(c). Additionally, the defendant contends that Warrant 149 was invalid because the affidavit was not expressly incorporated by reference into the warrant.

Under both the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution a search warrant must contain a particular description of the items to be seized. See State v. Henning, 975 S.W.2d 290, 296 (Tenn. 1998) (citing cases). This requirement serves as a limitation, both upon governmental intrusion into a citizen's privacy and property rights and upon the discretion of law enforcement officers conducting the search. Id. To satisfy the particularity requirement, a warrant "must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." Henning, 975 S.W.2d at 296 (internal quotations and citations omitted). This Court has stated:

> where the purpose of the search is to find specific property, it should be so particularly described as to preclude the possibility of seizing any other. On the other hand, if the purpose be to seize not specified property, but any property of a specified character which, by reason of its character, and of the place where and the circumstances under which it may be found, if found at all, would be illicit, a description, save as to such character, place and circumstances, would be unnecessary, and ordinarily impossible.

Lea v. State, 181 S.W.2d 351, 352-53 (1944); see also Henning, 975 S.W.2d at 296.

Applying these well-settled principles to the facts in this case, we note that Warrants 146 and 149 authorized searches of the defendant's residence for items "which may be identified" as property belonging to the victims or the restaurants,[3] and any items that "may be used to cause the death of the victims." Warrant 149 additionally authorized a search for "any and all financial records to include those indicating" money paid by the defendant on an automobile lease around the time of

---

[3] At the time of this investigation, the defendant was also under investigation for the murders, robbery and assault of employees of a Nashville McDonald's restaurant.

the murders.[4] An affidavit was attached to each warrant, setting forth the nature and circumstances of the crimes and noting several items that had been taken from the restaurants, including bank bags.

We agree with the trial court and the Court of Criminal Appeals that, as in Lea, the purpose of the search was not to find specific property, but to find property of a specific character, i.e., items that may have been taken from the restaurants and the victims, murder weapons, and financial records. Providing a description of everything which may have been taken from the victims and the restaurants was not possible. Nonetheless, the warrants described the character of the property with sufficient particularity "to enable the searcher to reasonably ascertain and identify" the items subject to seizure. Henning, 975 S.W.2d at 296. Therefore, these descriptions satisfy the particularity requirement.

Finally, the plain view doctrine authorizes officers conducting a lawful search to seize contraband, fruit of the crime, or evidence of criminal conduct even though it is not specified in a warrant when these items are in plain view. See, e.g., State v. Meeks, 867 S.W.2d 361, 373 (Tenn. Crim. App.), perm. app. denied (Tenn. 1993). In this case, the Court of Criminal Appeals properly held that the officers were entitled to seize the jars of coins, shoes, hats, knives, photographs, and other items under the plain view doctrine because these items were in plain view and the officers justifiably considered these items to be contraband, or fruits of the crime, or evidence of criminal conduct. This issue is without merit.

The defendant further argues that, because the crimes had been committed several months before the warrants were issued in June of 1997, the information in the affidavits was too stale to establish a nexus between the crime and the place to be searched. The defendant also contends that the affidavits do not indicate that the police had probable cause to believe that evidence of the crimes would be located at the defendant's residence.

To establish probable cause an affidavit must set forth facts from which a reasonable conclusion may be drawn that the evidence will be found in the place for which the warrant authorizes a search. State v. Vann, 976 S.W.2d 93, 105 (Tenn. 1998); State v. Longstreet, 619 S.W.2d 97, 99 (Tenn.1981). In addition, the affidavit must contain information which will allow a magistrate to determine whether the facts are too stale to establish probable cause at the time issuance of the warrant is sought. Vann, 976 S.W.2d at 105. While the lapse of time between the commission of a crime and the issuance of a search warrant may affect the likelihood that incriminating evidence will be found, probable cause is a case-by-case determination. State v.

---

[4]Law enforcement officers executed seven search warrants, and the defense challenged all of these warrants in pretrial motions. The State, however, gave notice prior to trial that it did not intend to introduce the evidence seized pursuant to the other five warrants. Thus, on appeal, the defendant challenges the validity of only Warrants 146 and 149 and the evidence that was seized under the authority of these and admitted at trial. Officers executing Warrant 146 seized four jars of coins, six pairs of shoes, one duffle bag, one brown carry bag, assorted photographs, one Bible, three knives, and three hats. Officers executing Warrant 149 seized a box of photograph albums, a bag containing photographs and negatives, a bag of assorted letters and mail, women's toiletry items, keys, teeth molds, and assorted magazines, papers, and notes.

Meeks, 876 S.W.2d 121, 124 (Tenn. Crim. App.), perm. app. denied (Tenn. 1993). In making this determination, courts should consider whether the criminal activity under investigation was an isolated event or a protracted pattern of conduct. Courts also should consider the nature of the property sought, the normal inferences as to where a criminal would hide the evidence, and the perpetrator's opportunity to dispose of incriminating evidence. State v. Dellinger, 2002 WL 927423, *8 (Tenn. 2002); State v. Smith, 868 S.W.2d 561, 572 (Tenn. 1993).

In this case, the criminal conduct under investigation was not an isolated event. As indicated in the warrants, the crimes occurred almost one month apart, with the last crime committed on March 23, 1997, less than three months prior to the time the warrants were being sought. The warrants sought any items that had been taken from the restaurants or the victims or that may have been used to cause the death of the victims. The affidavits set out the circumstances of the Captain D's and McDonald's robberies, including the fact that the only person who had survived the crimes had been repeatedly stabbed and left for dead. The affidavits further noted that the defendant's fingerprint had been recovered from an item belonging to one of the Captain D's victims, that the murder scenes were extremely bloody, that the victims' blood could be on the defendant's clothing, and that the defendant could still have in his possession or on his premises instruments of violence used to murder the victims or personal items belonging to the victims. Clearly, the affidavits provide an explanation for why the items sought by the warrants are capable of, and are in fact, likely to be hidden in the defendant's residence. As this Court explained in Smith,

> where the object of the search is a weapon used in the crime or clothing worn at the time of the crime, the inference that the items are at the offender's residence is especially compelling, at least in those cases where the perpetrator is unaware that the victim has been able to identify him to the police. Other instrumentalities are also likely to be in the offender's home, especially when there is reason to believe he would make use of them there.

868 S.W.2d at 572. Where, as here, a perpetrator believes he has eliminated or incapacitated all witnesses so that law enforcement officials are unlikely to discover his criminal activity, it is neither unreasonable nor unlikely that the perpetrator would keep clothing, or the murder weapons, or items taken during the crime at his residence. See Smith, 868 S.W.2d at 572. Therefore, we conclude that the trial court and Court of Criminal Appeals correctly found that the affidavits set forth sufficient facts from which the magistrate reasonably could have concluded that a nexus existed between the crime and the place to be searched and that the facts were sufficiently recent to establish probable cause.

The defendant next claims that the trial court and Court of Criminal Appeals should have held the warrants invalid because the officers executing the warrants failed to personally deliver a

copy of the warrants to him at the Cheatham County Jail as required by Tennessee Rule of Criminal Procedure 41(c).[5] We disagree.

It is undisputed that the officers executing the warrants were aware of the defendant's whereabouts. It is also undisputed that the detectives left a copy of the search warrant locked inside the defendant's residence, from which the property was taken. The rule requires nothing more. In pertinent part, Rule 41 provides:

> [T]he failure of the serving officer <u>where possible to leave a copy with the person or persons on whom the search warrant is being served,</u> shall make any search conducted under said search warrant an illegal search and any seizure thereunder an illegal seizure.

(Emphasis added.) As the Court of Criminal Appeals noted, there was no one present on whom the officers could serve the warrant at the time it was executed; therefore, <u>it was not possible</u> for the officers to leave a copy with the person being served. Rule 41(c) does not require officers to deliver a copy of the search warrant to a person who is not present. Instead, subsection (d) of Rule 41 indicates that an officer taking property under a warrant shall "give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken <u>or shall leave the copy and receipt at a place from which the property was taken</u>." (Emphasis added.) In this case, the officers left the warrant at the defendant's residence, the place from which the property was taken. This issue is without merit.

Lastly, the defendant contends that Warrant 149 is invalid because, unlike Warrant 146, it does not expressly incorporate by reference the affidavit of probable cause. Again, we are constrained to disagree. While an affidavit is an indispensable prerequisite to the issuance of a search warrant, an affidavit is not considered part of the warrant in this State. <u>Henning</u>, 975 S.W.2d at 296. There is no statute or rule requiring that a warrant expressly incorporate by reference the probable-cause affidavit. Therefore, the mere failure to incorporate the affidavit does not render the warrant invalid. This issue is without merit.

### III. Sufficiency of the Evidence

The defendant next asserts that the evidence presented is insufficient to support his convictions because the State failed to prove beyond a reasonable doubt his identity as the perpetrator of the crimes.

The proper inquiry for an appellate court reviewing a challenge to the sufficiency of the evidence to support a conviction is whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond

---

[5]As previously noted, the defendant's incarceration in the Cheatham County Jail stemmed from another incident where he allegedly attempted to kidnap the manager of a Shoney's restaurant.

a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed.2d 560 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999); Tenn. R. App. P. 13(e). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not re-weigh or re-evaluate the evidence. Id. Nor may this Court substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. See State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); Liakas v. State, 286 S.W.2d 856, 859 (1956). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993), quoting State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury. Carruthers, 35 S.W.3d at 557-58; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In contrast, the State on appeal is entitled to the strongest legitimate view of the trial evidence and all reasonable and legitimate inferences which may be drawn from the evidence. See Carruthers, 35 S.W.3d at 557-58; Hall, 8 S.W.3d at 599; Bland, 958 S.W.2d at 659. The standard of appellate review is the same whether the conviction is based upon direct or circumstantial evidence. Carruthers, 35 S.W.3d at 557-58; Vann, 976 S.W.2d at 111.

Briefly summarized, the record reflects that prior to this crime the defendant had discussed robbing fast food restaurants with co-workers as a way to obtain more money, that he had worked at a Shoney's near the scene of the crime, that he had obtained a job application the night before the murders from a Captain D's employee who informed him to come back the next afternoon to speak with manager, Steve Hampton, and that he asked this employee whether anyone would be at the restaurant the following morning. The defendant also had asked a friend to help him obtain a .32 caliber revolver prior to the crimes. The victims were shot a total of eight times with a .32 caliber weapon, probably a revolver, which had to be manually reloaded after six shots. After these crimes, the defendant told a man from whom he was purchasing a .25 automatic pistol that he previously had a .32 caliber revolver but did not like the way it shot and wanted something that had a clip to hold more bullets. Two witnesses placed the defendant and his vehicle outside Captain D's on the morning of the murders. Another witness saw a man matching the defendant's appearance standing at the door of Captain D's talking to Steve Hampton on the morning of the murders and said this unidentified man had white paper in his hand. Although the defendant had been experiencing serious financial trouble prior to the crime, the proof showed that he spent over $6,000 in cash within two weeks of the crime. Police found $1,000 in coins at the defendant's residence a few months after this crime. The total amount of cash and coins taken from Captain D's during the robbery was $7,140. The defendant's fingerprint was found on a movie rental card belonging to one of the victims, which was discovered the day after the murders discarded on a road only 1.2 miles from the defendant's home. Shoe prints found inside Captain D's were consistent in length with shoes seized from the defendant's residence. Although the tread patterns did not match shoes seized from the defendant's home, a photograph of the defendant showed him wearing a pair of dingy white tennis

shoes that police did not find. One witness who identified the defendant as the man leaving Captain D's on the morning of the murders said he was wearing "not new" white tennis shoes. Considering the proof in the record in the light most favorable to the State, we conclude that the proof points the finger of guilt unerringly at the defendant and the defendant alone. Therefore, the defendant's challenge to the sufficiency of the evidence is without merit.

### IV.  Improper Cross-Examination of Janet Kirkpatrick

Prior to trial, the defense team interviewed the defendant's sisters. A summary of the joint interview was provided to the defense experts, the State's experts, and the prosecuting attorneys. During the penalty phase of the trial, one of the defendant's sisters, Janet Kirkpatrick, testified on his behalf. On direct, Kirkpatrick discussed much of the information contained in the summary of the joint interview, and she acknowledged that the defendant had been previously incarcerated. Before cross-examining Kirkpatrick, the prosecuting attorneys approached the bench and stated their intent to impeach Kirkpatrick's testimony by questioning her about information in the interview summary detrimental to the defense that was not brought out during direct. Defense counsel did not object to this line of inquiry at the bench conference even though, as the trial court found, they were "fully aware of the contents of that interview, including the underlying facts of the previous robbery."

Against this backdrop, the assistant district attorney during cross-examination asked Kirkpatrick whether she "was aware that during an attempt to rob a restaurant, [the defendant] was putting one of the victims in the freezer when the victim --."[6] Defense counsel objected, and the trial court held a jury-out hearing at which Kirkpatrick denied making this statement during the interview. Rather, Kirkpatrick indicated that her sister had made the statement based upon a newspaper article her sister had read. Although she agreed that the interview summary suggested that both sisters had knowledge of the incident, Kirkpatrick maintained that she had no personal knowledge of the facts of the crime and had merely agreed with her sister. Following this testimony, defense counsel moved for a mistrial. The trial court sustained defense counsel's objection to the question but denied the defendant's request for a mistrial.

In addition, when the jury returned to the courtroom, the trial court provided the following curative instruction:

> Ladies and gentlemen of the jury, before you went upstairs for your afternoon break, General Thurman had asked a question of this witness. I sustained an objection, and that information is now stricken from the record. You may not consider that for any reason, and you must treat it as if you had never known it.
>
> Again, I remind you that you may not consider allegations of criminal behavior or prior crimes with regard, that you've been hearing this afternoon, except as to how

---

[6]This incident occurred in Texas and resulted in the defendant's arrest and conviction for robbery.

it relates to the mental health of the defendant. The State is relying upon the prior conviction for its aggravating circumstance involving the robbery charge that was committed on the dates on the certified copy, and you may not consider other crimes or other criminal behavior for any reason, other than the mental condition of the defendant.

Despite this instruction, the defendant submits that the trial court erred in refusing to grant a mistrial. He argues that the prosecutor's question informed the jury that the defendant had previously attempted to commit a crime under circumstances almost identical to these crimes, and therefore, was so prejudicial that the trial court's curative instruction could not remove its effect. The State responds that the trial court properly denied the defendant's request for a mistrial. The law is well-settled that the decision of whether or not to enter a mistrial rests within the sound discretion of the trial court. This Court will not interfere with the trial court's decision absent a clear abuse of discretion on the record. See State v Adkins, 786 S.W.2d 642, 644 (Tenn. 1990); State v. Inlow, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000).

The record in this case shows no abuse of discretion. The question about which the defendant complains was posed during the sentencing hearing. The jury had already found the defendant guilty of committing these murders; therefore, any prejudice associated with the question was minimized by its timing. The defense team did not object to this line of questioning at the bench conference. Once an objection was made, the trial court immediately considered the issue at a jury-out hearing. Moreover, before the prosecution posed this question, the defense team, attempting to illustrate the defendant's mental problems, had presented extensive evidence regarding the defendant's involvement in other crimes. In addition, the State had presented proof of the defendant's previous violent felony conviction to support the (i)(2) aggravating circumstance. The jury therefore had been informed prior to this question by both prosecution and defense proof that the defendant had a prior criminal record. The question provided little new information to the jury, and the trial court immediately sustained the objection and instructed the jury not to consider the question "for any reason" and to "treat it as if you had never known it." In addition, the trial court advised the jury not to "consider other crimes or other criminal behavior for any reason, other than the mental condition of the defendant." Jurors are presumed to follow the instructions of the trial court. State v. Stout, 46 S.W.3d 689, 715 (Tenn. 2001); State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998). Under these circumstances, the trial court did not abuse its discretion by denying the defendant's request for a mistrial. This issue is without merit.

### V. Alleged Errors Relating to Victim Impact Evidence and Argument

The defendant next contends that admission of victim impact evidence under the guidelines of State v. Nesbit, 978 S.W.2d 872 (Tenn. 1998), infringed upon his right to be free from ex post facto laws and violated this Court's decision in State v. Smith, 893 S.W.2d 903, 919 (Tenn. 1994), holding that capital sentencing proceedings must be conducted in accordance with the law in effect at the time the offense is committed. The defendant argues that under the law in effect in 1997, when these offenses were committed, victim impact evidence was not admissible because this Court

had held in Cozzolino v. State, 584 S.W.2d 765, 768 (Tenn. 1979), that evidence was admissible at a capital sentencing hearing only if it was relevant to an aggravating circumstance or to a mitigating circumstance raised by the defendant.

Initially we note that the Ex Post Facto Clause does not by its own terms apply to judicial decisions. See generally U.S. Const. Art. 1, §§ 9 and 10; Tenn. Const. Art. I, § 11; Rogers v. Tennessee, 532 U.S. 451, 456, 121 S. Ct. 1693, 1699, 149 L. Ed.2d 697 (2001). To the extent that due process protects interests similar to those protected by the Ex Post Facto Clauses of the state and federal constitutions, retroactive application of an alteration of a common law doctrine of criminal law violates due process only where the alteration is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." Rogers, 532 U.S. at 461, 121 S. Ct. at 1700. A review of Nesbit immediately reveals that the decision did not alter a common law doctrine of criminal law or apply a new interpretation to the capital sentencing statute.

In Nesbit, this Court held that victim impact evidence and argument is not barred by the federal or state constitution. 978 S.W.2d at 889; see also Payne v. Tennessee, 501 U.S. 808, 827, 111 S. Ct. 2597, 2609, 115 L. Ed.2d 720 (1991) (holding that the Eighth Amendment erects no *per se* bar against the admission of victim impact evidence and prosecutorial argument). This Court further stated that Tennessee Code Annotated section 39-13-204(c)(1997)

> enables the sentencing jury to be informed about the presence of statutory aggravating circumstances, the presence of mitigating circumstances, and the nature and circumstances of the crime. The statute allows the sentencing jury to be reminded "that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family."

Nesbit, 978 S.W.2d at 890 (quoting Payne, 501 U.S. at 825, 111 S. Ct. at 2608). In so stating, this Court expressly rejected the interpretation of Cozzolino now advanced by the defendant, and pointed to many prior decisions admitting evidence about the nature and circumstances of the crime, even though such proof is not necessarily related to a statutory aggravating circumstance, and emphasized that victim impact evidence is encompassed within the statutory language "nature and circumstances of the crime." Nesbit, 978 S.W.2d at 890. While the decision in Nesbit expressly clarified existing practice in Tennessee relating to victim impact evidence, the decision did not change existing law. The defendant's sentencing hearing was conducted pursuant to the statute discussed in Nesbit; therefore the defendant's assertion that admitting victim impact evidence constituted an ex post facto violation is without merit.

The defendant next asserts that the victim impact testimony in this case exceeded the scope of permissible victim impact testimony established by Nesbit. Although victim impact evidence is admissible, such evidence generally should be "limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those

circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family." Nesbit, 978 S.W.2d at 891. Victim impact evidence may not be introduced if it is so unduly prejudicial that it renders the trial fundamentally unfair or its probative value is substantially outweighed by its prejudicial impact. See Nesbit, 978 S.W.2d at 891 (citations omitted). To enable the trial court to adequately supervise the admission of this evidence and ensure that it is properly limited: (1) the State must notify the trial court of its intent to introduce victim impact evidence; (2) the trial court must then hold a jury-out hearing to determine the admissibility of the evidence; and (3) the evidence should not be admitted until the trial court determines that evidence of one or more aggravating circumstances is already present in the record. Nesbit, 978 S.W.2d at 891.

The trial court in this case meticulously followed these procedural safeguards before admitting the testimony of Steve Hampton's wife and mother and the testimony of Sarah Jackson's parents and older brother. This testimony has previously been thoroughly recited and need not be reiterated here. The defendant maintains that the trial court should have excluded certain portions of this testimony, including the testimony of Gina and Wayne Jackson regarding Sarah Jackson's suffering and fear at the time of the crimes; the testimony of Gina Jackson that she thought that her daughter was safe while working at Captain D's; the testimony of Deanna Hampton that her daughter asked who would walk her down the aisle at her wedding; the testimony of Jerry Jackson about how difficult it was for him to see other fathers march the bride down the aisle; the testimony about how the Jackson family set out Sarah's picture, a candle, and a place setting for her at family gatherings; and the testimony about how the Jackson family felt guilty about Sarah's death and "allocated fault" among themselves.

The defendant also complains that the victim impact evidence presented was different from the evidence approved by the trial court at the jury-out hearing. Specifically, he points to Deanna Hampton's testimony about the effect of her husband's death on her son's birthday celebration and her husband's character as a good father, Jerry Jackson's testimony about how Sarah and her family were robbed of her potential and "money is money" but "you can't replace" someone's life, and Wayne Jackson's testimony about his opinion of the crime and his sister's fear and suffering. The defendant says that this evidence rendered the sentencing hearing fundamentally unfair and that, even if individual portions of the testimony alone do not warrant reversal, the cumulative prejudicial effect of this testimony mandates reversal. We disagree.

As stated, "victim impact evidence should be limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family." Nesbit, 978 S.W.2d at 891 (citations omitted). The testimony about which the defendant complains is well within these parameters. Most of this testimony demonstrated how the contemporaneous circumstances surrounding the victims' deaths had psychologically affected their immediate family members. While the testimony was not word-for-word the same, the Court of Criminal Appeals correctly noted that the testimony offered before

the jury did not differ in kind or scope from that offered at the jury-out hearing. The victim impact evidence complained of by the defendant was not unduly prejudicial and clearly falls within the parameters established in Nesbit. See generally State v. Austin, 2002 WL 31103628 (Tenn. 2002); State v. Stevens, 78 S.W.3d 817, 828 (Tenn. 2002); State v. McKinney, 74 S.W.3d 291, 309-10 (Tenn. 2002); Smith, 993 S.W.2d at 17.

Moreover, nothing in the record indicates that admission of this evidence rendered the sentencing hearing fundamentally unfair. As previously stated, the trial court scrupulously followed the dictates of Nesbit and, with respect to the conduct of the victims' families during this proceeding, stated:

> The victims' family members were present during the pretrial hearings, the trial, and portions of jury selection. Despite the trauma they suffered when their loved ones were senselessly murdered, they showed the utmost respect for the judicial process at all times.

While "a few of the jurors shed tears during portions of the victim impact testimony," the trial court noted "none of the jurors became overly emotional. They simply demonstrated a normal reaction to [such] testimony." After thoroughly reviewing the record, we agree with the trial court and the Court of Criminal Appeals that the victim impact evidence was not unduly prejudicial and did not render the sentencing proceeding fundamentally unfair.

Next, the defendant avers that a contradiction exists between Tennessee Code Annotated section 39-13-204(g)(1) and the jury instruction regarding victim impact evidence set out by this Court in Nesbit. The defendant maintains that this contradiction renders victim impact evidence irrelevant. Tennessee Code Annotated section 39-13-204(g)(1) provides in pertinent part:

> If the jury unanimously determines that
> (A) At least one (1) statutory aggravating circumstance or several statutory aggravating circumstances have been proven by the state beyond a reasonable doubt; and
>
> (B) Such circumstance or circumstances have been proven by the state to outweigh any mitigating circumstances beyond a reasonable doubt; then the sentence shall be death.

The jury instruction set out by this Court in Nesbit is as follows:
> The prosecution has introduced what is known as victim impact evidence. This evidence has been introduced to show the financial, emotional, psychological, or physical effects of the victim's death on the members of the victim's immediate family. You may consider this evidence in determining an appropriate punishment. However, your consideration must be limited to a rational inquiry into the culpability of the defendant, not an emotional response to the evidence.

-24-

Victim impact evidence is not the same as an aggravating circumstance. Proof of an adverse impact on the victim's family is not proof of an aggravating circumstance. Introduction of victim impact evidence in no way relieves the State of its burden to prove beyond a reasonable doubt at least one aggravating circumstance which has been alleged. <u>You may consider this victim impact evidence in determining the appropriateness of the death penalty only if you first find that the existence of one or more aggravating circumstances has been proven beyond a reasonable doubt by evidence independent from the victim impact evidence, and find that the aggravating circumstances found outweigh the finding of one or more mitigating circumstances beyond a reasonable doubt.</u>

<u>Nesbit</u>, 978 S.W.2d at 892 (emphasis added). The defendant says a contradiction exists because the statute provides that the jury <u>shall</u> return a verdict of death upon finding the existence of an aggravating circumstance beyond a reasonable doubt that outweighs any mitigating circumstances beyond a reasonable doubt, while the <u>Nesbit</u> instruction allows the jury to consider victim impact evidence only after it has found that at least one aggravating circumstance exists, and that the aggravating circumstance outweighs the mitigating circumstances beyond a reasonable doubt. The defendant concludes that victim impact evidence is "mooted" by the instruction and serves no purpose in the sentencing scheme.

Assuming, for the sake of argument, that the defendant is correct, he certainly has no basis to complain because, as the State points out, any contradiction between the statute and the instruction inures to his benefit. <u>See, e.g.</u>, <u>Smith</u>, 993 S.W.2d at 13, n.7; <u>State v. Bush</u>, 942 S.W.2d 489, 506, n.10 (Tenn. 1997); <u>State v. Carter</u>, 714 S.W.2d 241 (Tenn. 1986). Therefore, this complaint does not entitle the defendant to relief.

During oral argument, the State indicated that it is not opposed to this Court reconsidering the <u>Nesbit</u> instruction and stated that the portion of the instruction challenged by the defendant unnecessarily limits the jury's consideration of victim impact evidence. Although the State's brief includes no discussion of the instructions used by other jurisdictions, at oral argument the State indicated that some jurisdictions do not provide a jury instruction on victim impact evidence and other jurisdictions take a "minimalist" approach by simply advising the jury that victim impact evidence is not an aggravating circumstance.

It is beyond dispute that any effective instruction on this subject must advise the jury that victim impact evidence is not the same as an aggravating circumstance. As to the instructions used by other jurisdictions, we note that the <u>Nesbit</u> instruction was based upon precedent from other jurisdictions, in particular Oklahoma and Georgia.[7] Nevertheless, we wish to emphasize that the <u>Nesbit</u> instruction was simply a suggestion. <u>Nesbit</u>, 978 S.W.2d at 892 ("[W]e hereby suggest the following instruction . . . ."). By suggesting this language we did not intend to preclude individual trial judges or the Committee on Pattern Jury Instructions (Criminal) of the Tennessee Judicial

_____

[7]<u>Nesbit</u>, 978 S.W.2d at 892 (citing cases).

Conference ("Committee") from making necessary and appropriate revisions to this instruction. Indeed, trial judges and the Committee, which is composed of trial judges, are often better situated to assess the practical effectiveness or ineffectiveness of this particular instruction and make needed language changes.[8]

The defendant also complains that the prosecutors engaged in improper closing argument regarding the function of victim impact evidence and argues that the trial court erred by failing to grant a mistrial based upon this improper argument. As previously stated, the decision of whether to grant a mistrial is within the sound discretion of the trial court, and the trial court's decision will not be reversed absent a clear showing of abuse of discretion. Adkins, 786 S.W.2d at 644; Inlow, 52 S.W.3d at 105.

As the State asserts, the defendant failed to contemporaneously object to the prosecutor's argument that the jury should consider what the victim's death "meant to the community" and that the jury should "show [the defendant] the same mercy that he showed to Steve and Sarah." Despite defense counsel's failure to object, the trial court provided a curative instruction, stating, "Ladies and Gentlemen of the Jury, you are to do an individualized sentencing based on the law and facts with regard to the case and Mr. Reid. You are to do so without regard to the effect on the community." The defendant's failure to object to these comments constitutes waiver on appeal. See State v. Green, 947 S.W.2d 186, 188 (Tenn. Crim. App. 1997); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (failure to object to prosecutor's alleged misconduct during closing argument waives later complaint); State v. Thornton, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999) (citing Tenn. R. App. P. 36(a)). Moreover, a review of the record clearly indicates that these comments do not amount to plain error. In light of the limited nature of the comments and the trial court's curative instruction, any error was harmless. See State v. Burns, 979 S.W.2d 276, 283 (Tenn. 1998) (finding more extensive argument harmless error).

The defendant also contends that during rebuttal argument the prosecutor improperly told the jury that it could consider the victim impact evidence during the weighing process and engaged in inflammatory argument designed to elicit an irrational and emotional response from the jury. The defendant contends that the cumulative effect of this improper argument mandates reversal. The following is an excerpt of the argument to which the defendant objects:

> GENERAL THURMAN: Aggravating circumstances. We've talked about those. General Moore talked about them, and they are really not an issue. Mr. Engle admits that all those aggravating circumstances are present in this case, so that is not the issue now. Now you have the weighing issue, and if you weigh what we've talked about, if you weigh it, any mitigation you found for Mr. Reid, and I submit it is very slight, I think there is but one verdict under the law. You weigh it in your mind. What is the verdict? When you weigh it, I want you to consider the facts about these

---

[8] Both the defense and the State are urged to submit concerns and suggestions regarding this instruction to the Committee for its consideration.

aggravating circumstances, the facts that this is a robbery, the facts that they were killed in cold blood because they were witnesses. You've seen that picture a lot, but when you weigh the circumstances of this crime, you have to think what was in Steve Hampton's mind, when he was shot and when he was still alive and was reaching up? What was he thinking in the last few seconds? And you weigh that against the mitigation. Sarah Jackson - -

MR. ENGLE: Objection, Your Honor, you cannot, the law doesn't allow the weighing of the facts of the crimes as against the mitigating evidence.

THE COURT: Sustained. Rephrase.

GENERAL THURMAN: They can consider all the facts and circumstances of the crime, which I'm asking.

THE COURT: They can consider. I will – ladies and gentlemen of the jury, I will instruct you as to how you are to weigh things.

GENERAL THURMAN: But you can consider that. You consider what Sarah Jackson had to go through in considering these aggravating factors, after she was shot, after she had to wait knowing Steve Hampton was being shot, and she was next, and how after she was shot, she was struggling to get up, thinking maybe, maybe I've survived, maybe he is gone, and when you are weighing his background, his childhood, weigh what kind of man could stand there and calmly reload, one shell at a time, in that pistol while she is struggling there, and what kind of man cannot have pity, and what kind of man did walk in there and execute that young girl?

This kind of man, and he can't blame his mother. He can't blame his father. He can't blame the Texas Department of Correction. He is responsible. This man. That is the man the expert witnesses for the defense didn't want you to see. That is the man that suffered from this psychosis that can't hardly deal with the world. That is the man. Paul Reid celebrating, spending his money, shopping. It looks like he is functioning pretty well; doesn't it? While he is toasting his margarita and you are weighing the circumstances, think about the three children that are saying where is my daddy? Think about the parents struggling to get through one more day while he is celebrating.

Now even though a lot of this case is about Paul Reid and the mitigation that you have to consider, you don't have to forget those faces, those lives, and the lives that were destroyed, besides those two, of the families. The Judge will tell you you can consider that. You consider that when you weigh those aggravating circumstances. They were real people with real dreams - -

MR. ENGLE: Your Honor, I'm sorry, but, again, this is a misstatement of the law.

GENERAL THURMAN: It is not a misstatement of the law. They can consider that, Your Honor.

THE COURT: Consider it – I will instruct the jury in terms of how they should consider this.

GENERAL THURMAN: But don't forget all the lives, not only theirs, that were destroyed by Paul Reid, and it's time for him to face the responsibility for that. It's time for him to have the ultimate punishment. Each of you know what that is. It's time for justice. Thank you.

In evaluating the prejudicial effect of any improper prosecutorial argument, this Court must consider:

1. The conduct complained of viewed in light of the facts and circumstances of the case;
2. The curative measures undertaken by the court and the prosecution;
3. The intent of the prosecutor in making the improper arguments;
4. The cumulative effect of the improper conduct and any other errors in the record; and
5. The relative strength and weakness of the case.

Nesbit, 978 S.W.2d at 894. Applying these factors, we are of the opinion that any error was harmless. Any impropriety in the prosecutor's closing argument is slight. While the prosecutor should have used the word "consider" rather than "weigh," there is no evidence that the prosecutor acted in bad faith, and in fact, his responses to defense objections indicated that he was attempting to comply precisely with the dictates of Nesbit. Moreover, the trial court sustained defense objections, properly instructed jurors as to the nature and function of victim impact evidence, emphasized that jurors should apply the law as provided by the court, and reminded jurors that argument of counsel is not evidence. This was a well-tried case from beginning to end, and the cumulative effect factor simply does not apply because this trial was nearly error-free. Finally, the State's case at sentencing was very strong, with clear proof of the three aggravating circumstances and substantial proof rebutting the mitigating evidence. Accordingly, under these circumstances, we have no hesitation in finding any improper argument during the prosecutor's closing harmless. Nesbit, 978 S.W.2d at 893-94.

## VI. Proportionality Review

Finally, this court is statutorily required to determine whether: (1) the sentences of death were imposed in any arbitrary fashion; (2) the evidence supports the jury's finding of statutory aggravating circumstances; (3) the evidence supports the jury's finding that the aggravating circumstances

outweigh any mitigating circumstances; and (4) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. Tenn. Code Ann. § 39-13-206(c)(1) (1997). A thorough review of the record reveals that the evidence is sufficient to support the jury's finding of the three aggravating circumstances and the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Additionally, there is no indication that the sentences of death were imposed in an arbitrary fashion.[9]

Finally, the sentences of death in this case are not disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. Tenn. Code Ann. § 39-13-206(c)(1)(D). A death sentence is disproportionate only if it is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." Bland, 958 S.W.2d at 665. A death sentence is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which the defendant has received a life sentence. Id. at 665. Thus, the duty of an appellate court is not to "assure that a sentence less than death was never imposed in a case with similar characteristics," but instead to "assure that no aberrant death sentence is affirmed." Id.

While there is no mathematical or scientific formula involved in comparing similar cases, this Court generally considers: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victim's circumstances, including age, physical and mental conditions, and the victim's treatment during the killing; (6) the absence or presence of provocation; (7) the absence or presence of justification; and (8) the injury to and effects on non-decedent victims. See Vann, 976 S.W.2d at 107 (citing Bland, 958 S.W.2d at 667). When reviewing the characteristics of the defendant, we consider (1) the defendant's prior record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of the helplessness of the victim; and (8) the defendant's capacity for rehabilitation. Id. Moreover in conducting this review, "we select from the pool of cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death." Carruthers, 35 S.W.3d at 570 (citing Bland, 958 S.W.2d at 666).

Considering the record in this case in light of these factors, the proof shows that, while

---

[9]The dissent asserts that the majority has made "no meaningful effort to address and rectify" the concerns expressed in his dissenting opinion and in dissenting opinions filed in previous cases. To the contrary, a majority of this Court has thoroughly considered and repeatedly rejected the dissent's challenges to the proportionality review process, choosing instead to adhere to the framework carefully explained in State v. Bland, 958 S.W.2d 651 (Tenn. 1997). See, e.g., State v. Godsey, 60 S.W.3d 759, 781-86 (Tenn. 2001); State v. Bane, 57 S.W.3d 411, 430 (Tenn. 2001); State v. Stout, 46 S.W.3d 689, 708 (Tenn. 2001); State v. Keen, 31 S.W.3d 196, 223-24 (Tenn. 2000); Bland, 958 S.W.2d at 666-670. A majority of this Court remains convinced that the proportionality analysis outlined in Bland is more than sufficient to ensure that no aberrant death sentence is imposed.

robbing a Captain D's, the defendant repeatedly shot two unresisting employees as they were lying face down on the floor. Sarah Jackson had been shot at close range four times in the back of the head and once in the back. Steve Hampton had been shot at close range twice in the back of the head and once in the back. The number of wounds suggested that the defendant manually reloaded his .32 caliber revolver during the assault. Both the robbery and the murders appear to be premeditated, intentional, and well-planned, lacking any indicia of impulsiveness. The apparent motivations for the robbery and murders are greed and a desire to avoid prosecution.

The defendant was thirty-nine-years-old at the time these crimes were committed and had been convicted in Texas in 1984 of aggravated robbery. In 1978, the defendant had two felony indictments in Texas dismissed based upon a finding of permanent incompetence, and he was judicially committed to a psychiatric hospital but was later found to be malingering. As a juvenile, the defendant received probation for a theft and assault charge. As to mitigation, the defendant introduced proof showing that he had an unstable childhood, that he had exhibited mental and behavioral problems from a very early age, and that he had brain damage that was caused by either a congenital defect or trauma. However, the proof established no causal connection between this brain damage and the crimes committed by the defendant. Although mental health professionals testified that the defendant was schizophrenic and delusional, there was substantial evidence regarding the defendant's history of malingering and testimony that any psychological disorder he suffered was in remission at the time he committed these offenses. Finally, no evidence was presented to show that the defendant cooperated with the authorities or exhibited remorse for the killings, and there is nothing in the record to indicate the defendant is amenable to rehabilitation.

While no two capital cases and no two defendants are alike, we have compared the circumstances of the present case with the circumstances of similar first degree murder cases and conclude that the penalty imposed in the present case is not disproportionate to the penalty imposed in similar cases. See, e.g., State v. Chalmers, 28 S.W.3d 913 (Tenn. 2000) (imposing the death penalty upon finding aggravating circumstance (i)(2) where the defendant shot and robbed a twenty-eight-year-old victim); State v. Cribbs, 967 S.W.2d 773 (Tenn. 1998) (imposing the death penalty upon finding the (i)(2) and (i)(7) aggravating circumstances where the twenty-three-year-old defendant murdered a woman after burglarizing her home); State v. Bush, 942 S.W.2d 489 (Tenn. 1997) (imposing the death penalty upon finding the (i)(5) and (i)(6) aggravating circumstances, despite substantial evidence of the defendant's troubled childhood, mental problems, and his initial incompetence to stand trial); Hines, 919 S.W.2d at 573 (imposing the death penalty upon finding the (i)(2), (i)(5), and (i)(7) aggravating circumstances despite evidence that the defendant had a troubled childhood, was abandoned by his parents, had abused drugs and alcohol as a teenager, and suffered from self-destructive behavior, paranoid personality disorder, dysthymia, and chronic depression); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994) (imposing the death penalty upon finding the (i)(2), (i)(5) and (i)(7) aggravating circumstances despite mitigation proof regarding the defendant's troubled childhood and his possible neurological damage); Smith, 868 S.W.2d at 561 (imposing the death penalty upon finding the (i)(5), (i)(6), (i)(7), & (i)(12) aggravating circumstances despite mitigation evidence that the defendant had been hospitalized for depression, paranoid personality disorder, chronic depressive neurosis, and paranoid delusional disorder); State v. Howell, 868

S.W.2d 238 (Tenn. 1993) (imposing the death penalty upon finding the (i)(2) and (i)(7) aggravating circumstances, despite substantial proof that the defendant had traumatic brain damage, where the twenty-seven-year-old defendant shot and killed a convenience store clerk during a robbery); State v. Harris, 839 S.W.2d 54 (Tenn. 1992) (imposing the death penalty upon finding the (i)(2), (i)(5), and (i)(7) aggravating circumstances, despite evidence of the defendant's lack of education and troubled childhood, where the thirty-two-year-old defendant murdered two employees during the robbery of a hotel).

After reviewing the cases set out above and others not herein detailed, we are of the opinion that the penalties imposed by the jury in this case are not disproportionate to the penalties imposed for similar crimes.

## VII. Conclusion

We have considered the entire record in this case and find that the sentences of death were not imposed in any arbitrary fashion, that the sentences of death are not excessive or disproportionate, and that the evidence supports the jury's finding of the statutory aggravating factors and the jury's finding that these aggravating factors outweighed mitigating factors beyond a reasonable doubt. We have also considered all the defendant's assignments of error and conclude that none require reversal. With respect to issues not specifically addressed herein, we affirm the decision of the Court of Criminal Appeals, authored by Judge David G. Hayes, and joined in by Judge John Everett Williams and Judge James Curwood Witt, Jr. Relevant portions of that opinion are published hereafter as an appendix. The defendant's convictions and sentences are affirmed. The sentences of death shall be carried out as provided by law on the 29th day of April, 2003, unless otherwise ordered by this Court or other proper authority. It appearing that the defendant is indigent, costs of this appeal are taxed to the State of Tennessee.


_____
FRANK F. DROWOTA, III,
CHIEF JUSTICE